[Crim. No. 200. Third Appellate District.—May 9, 1913.]

## THE PEOPLE, Respondent, v. CARY T. SCOTT, Appellant.

CRIMINAL LAW—SELLING LAND TWICE—REQUISITES OF OFFENSE.—One of the essential elements of the crime of selling land twice is an effectual first sale. A necessary circumstance contemplated by the statute is, that by reason of the second sale the first purchaser may be deprived of some interest that he acquired by virtue of the conveyance to him.

ID.—DELIVERY OF INSTRUMENT—PRESUMPTION FROM POSSESSION.—The presumption of delivery, which follows from the possession of an instrument, cannot be indulged in opposition to the presumption of innocence, where a material element of a serious criminal charge, such as selling land twice, is involved.

ID.—EVIDENCE—DECLARATIONS OF CONSPIRATOR.—In a prosecution for such offense, the declaration of the defendant's wife that the alleged first purchasers had better look out for "their property is in my name," and if my husband should die, they could not get it "unless I chose to give it to them," is not admissible on the theory that it relates to a conspiracy between the husband and wife.

ID.—EVIDENCE—COMPLAINT IN ACTION FOR DIVORCE.—It is error, in such prosecution, to admit in evidence the complaint in an action by the wife of the defendant brought against him for maintenance, which complaint alleges cruelty and gross immorality on his part.

ID.—INSTRUCTIONS IGNORING ESSENTIAL OF OFFENSE.—It is error to give instructions which ignore the fact that the statute, making it a crime to sell land twice, presupposes that the party charged with the fraud must have some title, legal or equitable, which he can and does sell. This is one of the necessary facts to be established before a conviction is justified.

ID.—QUESTION OF OWNERSHIP AND OF FACTS CONSTITUTING TITLE.—Any question of law as to what facts must be shown to constitute title is a subject for the cognizance of the court and for specific directions to the jury, but the ultimate fact of ownership or title must be determined by the jury as one of the elements that make up the crime.

APPEAL from a judgment of the Superior Court of Santa Cruz County and from an order refusing a new trial. Lucas F. Smith, Judge.

The facts are stated in the opinion of the court.

W. P. Netherton, and Geo. K. Ford, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

BURNETT, J.—In the information filed against him, defendant was charged with "selling land twice in violation of section 533 of the Penal Code of California." It was particularly set forth that, "on April 13, 1911, the defendant held in trust for one Victor E. Campbell the legal title in and to all of" certain lands situated in the state of Oregon; that thereafter, on said date, the defendant "bartered, agreed to sell and executed an agreement for the sale of said lands and premises to one M. J. Humphrey," which agreement is set out in full, providing for the exchange of said Oregon lands designated as "Class No. 1," for certain lands in Santa Cruz County, California, which are described and designated as "Class No. 2," and also "That the party of the first part" (C. T. Scott) "is to give $3,000"; that immediately after the execution of the agreement the defendant executed a conveyance of the lands of "Class No. 1" to said M. J. Humphrey and "a deed was duly executed in the county of Santa Cruz conveying unto the said Cary T. Scott all of the real estate set forth and described in 'Class No. 2' of said agreement" and that said deed to Scott, "on or about the 13th day of April, 1911, was delivered in escrow in the county of Santa Cruz, to one J. J. Morey, cashier of the Pajaro Valley National Bank" of Watsonville in said county; "that said deed was to be subsequently delivered by the said J. J. Morey to the said defendant, Cary T. Scott; that thereafter, to wit, on or about the 13th day of April, 1911, the said Cary T. Scott, for a valuable consideration, granted, bargained and sold, transferred and conveyed, bartered and disposed of, unto the said Victor Campbell, all of the right, title and interest of the said defendant, Cary T. Scott, in and to said agreement entered into with the said M. J. Humphrey, and in and to all of the properties therein described and in which the said defendant then and there had any interest"; that said transfer and conveyance

from the said Cary T. Scott to the said Victor E. Campbell was and is in the words and figures following, to wit: "Oakland, Cal., April 13th, 1911. For and in consideration of the sum of ten dollars, U. S. gold coin, to me in hand paid, I do hereby grant, bargain, transfer, sell and convey all my right, title and interest of all the properties herein described in this document, to V. E. Campbell, or his assigns, ''; that on said date this conveyance was delivered to said Campbell and he thereupon "became the absolute owner of all the right, title and interest of the said Cary T. Scott in and to said agreement with the said M. J. Humphrey, and in and to all of the real estate therein described in which the said defendant, Cary T. Scott, had any interest by virtue of said agreement"; that thereafter, while said conveyance was "in full force and effect, and while the said Victor E. Campbell was then and there the lawful owner and holder thereof, and without the knowledge or consent of said Victor E. Campbell, the said defendant, Cary T. Scott, on or about the 19th day of September, A. D. 1911, at and in the county of Santa Cruz, . . . willfully and unlawfully, fraudulently and feloniously, and with intent then and there to defraud the said Victor E. Campbell of all of the rights acquired by him from the said Cary T. Scott, did sell, barter and dispose of the same lands and premises . . . for a valuable consideration, to another person, to wit: to one John Humphrey Sullivan,'' who is now the owner and holder thereof; "that the said Victor E. Campbell was thereby defrauded of his interest in said real estate aforesaid."

The attorney-general, then, relies for support of the verdict upon these facts which he claims the evidence established: "First: That Campbell placed the title to his real property in Scott for the purpose of exchange; second: That Scott consummated a deal for its exchange and reduced the agreement to writing; third: Scott then, by a written assignment, assigned and transferred all of his right, title and interest in said exchange agreement to Campbell and delivered said agreement to Campbell; fourth: That subsequently, for a valuable consideration, and unknown to Campbell, and with intent to defraud Campbell, Scott again caused the same property to be conveyed to another; fifth: That Campbell was thereby defrauded."

The first, third and fourth of these declared facts are admitted by appellant to be supported by evidence.

As to the second, it is asserted that ''If, by this general and somewhat ambiguous statement it is meant that Scott executed an agreement with Mary J. Humphrey to exchange with the Oregon properties for the Watsonville properties, bearing in mind that she had no interest at all in the Watsonville properties then or at any other time, which were owned in their entirety by the Fruit Farm Company, this is admitted.''

As to the fifth, it is said: ''This is vehemently denied. Of course, we do not deny that if the testimony of certain witnesses is admitted to be true, it shows Scott was guilty of a breach of trust, and by the breach of that trust Campbell was defrauded. But, of course, this fact is entirely beside the question. We take it, therefore, that counsel means by this statement that Campbell actually acquired an interest in the Watsonville properties from Scott, and that Scott, by this second conveyance, fraudulently deprived Campbell of this interest so acquired. This we emphatically deny.''

The foregoing is probably sufficient for an understanding of the nature of the charge and of the main points of difference and discussion between counsel as to the sufficiency of the evidence to support the verdict.

It cannot be disputed that one of the essential elements of the crime charged, a material averment to be established, is the sale by Scott to Campbell of the Watsonville property. If there were no first, there could, of course, be no second sale. It is equally clear that if no interest in the property vested in Campbell by virtue of the alleged sale to him by Scott, Campbell could not have been defrauded by the transaction between Scott and Sullivan in relation to the same property. A necessary circumstance contemplated by the statute is that by reason of the second sale the first purchaser may be deprived of some interest that he acquired by virtue of the conveyance to him.

It is important, then, to inquire whether Scott, by his said conveyance executed on said April 13, 1911, transferred to Campbell any interest in the said property? The answer depends upon several considerations, one of which, manifestly, is whether he had any interest to convey. This, in

view of the allegation of the information, must be regarded
in a two-fold aspect. The first relates to the agreement with
M. J. Humphrey and the theory in relation to that is that
by its execution Scott became the equitable owner of the prop-
erty and this interest thus acquired he conveyed to Campbell.

This position, however, cannot be maintained for the rea-
son that M. J. Humphrey is shown by the evidence to have
had no title to the property either legal or equitable. Hav-
ing no interest, her agreement with Scott could transfer
none, and his assignment of said agreement or his conveyance
of all the interest therein acquired would, of course, be
equally ineffectual. According to the record, the legal title
was in the Pajaro Fruit Farm Company and *W. R. Humphreys*
was entitled to a conveyance on the payment of his indebted-
ness to the Pajaro Valley Bank, or, as stated by the cashier
of said bank: "The Pajaro Fruit Farm Company had title
to the property for Mr. Humphreys to secure Mr. Humphreys's
indebtedness to the Pajaro Valley Bank." Mr. Humphreys,
it may be remarked, was the principal owner of the stock
of said company, which had been assigned to the bank as ad-
ditional security for said indebtedness.

The agreement with M. J. Humphreys may then be elimi-
nated as the source of any title or interest in said property.

The other phase of the question is presented by the alle-
gation in the information that before said conveyance to
Campbell a deed of the property to Scott was executed and
delivered in escrow to the said cashier of the said bank to
be subsequently delivered to defendant.

Although the terms of the escrow agreement do not appear,
we may assume that by the said delivery of the deed to the
bank Scott became vested with the equitable title to the
property. Upon this assumption, his conveyance to Campbell
transferred the same title. The question then arises whether
this constituted Campbell a "purchaser" within the con-
templation of said section 533 of the Penal Code. Grant-
ing, however, that it did have that effect, it would be still a
vital requirement for the people to prove that the deed had been
delivered in escrow *before* the alleged sale to Campbell.
Therein the record falls short of the exaction of the law. In
reply to this point, respondent declares: "On the contrary,
Campbell testified that Scott told him the deeds were de-

livered in escrow before Humphreys left for Oregon, and that he left immediately after the execution of the exchange agreement.'' Appellant is mistaken in the contention that the testimony of Campbell as to the declaration of Scott was hearsay and inadmissible, since it clearly comes within the rule permitting evidence of the act, declaration, or omission of a party to an action. (Code Civ. Proc., sec. 1870, subd. 2.) Respondent is also mistaken in the contention that the time of said delivery was fixed by said statement of Scott. Mr. Campbell testified as to a conversation he had with Scott, but his testimony fails to point the time definitely. In reply to a question he answered: ''Mr. Scott told me that the deeds had been made for this Watsonville property and left in escrow in the bank—He said that Humphreys—When I saw Mr. Scott Mr. Humphreys had already gone to Oregon, Mr. Scott has given Mr. Humphreys an abstract of the property up there.'' As to the element of time, it is thus to be seen, the only definite inference is that said delivery took place prior to said conversation and the conversation was subsequent to Humphreys's trip to Oregon.

This important circumstance should not, of course, be left to mere surmise or suspicion.

The case, thus far considered, then appears as one requiring, in order to justify a conviction, the conveyance of the Watsonville property by Scott to Campbell, but presenting a failure of proof that the former actually did convey any title whatever to the latter.

As to the second sale of the property, the case for the people depended upon proof of the execution by defendant and his wife of a written instrument purporting to ''authorize and direct the Pajaro Valley Savings Bank to cancel and destroy that certain deed now held in escrow by said bank from Pajaro Fruit Farm Company to said C. T. Scott and Mildred Scott . . . and to convey said real property to John Humphrey Sullivan'' and which instrument absolved said fruit company from any and all liability to convey the property to Scott or his wife.

To be legally effectual this instrument, of course, must have been signed by Scott and delivered by him or under his authority to the bank or its agent. The evidence is undisputed that he affixed to it his signature. H. C. Wyckoff,

who represented the bank and the fruit company, testified: "I requested Mr. Scott to sign an instrument which was prepared there, requesting or consenting to the transfer of this property to Mr. Sullivan, which he and his wife signed." He stated, in this connection, that Mr. Scott objected to signing it, saying that "he did not want to sign it, didn't think it necessary," but that he afterward signed it. No witness, however, testified that Scott delivered or authorized the delivery of the document. It would have been a simple matter to interrogate Wyckoff concerning it, but it was probably overlooked.

This is a vital point in the case and while it might be, if it were a civil action, that the presumption of delivery would follow from the fact of possession of the instrument, this cannot be indulged in opposition to the presumption of innocence, where a material element of a serious criminal charge is involved.

Many rulings of the court as to the admissibility of evidence and the giving and refusing of certain instructions are challenged. Some of them we proceed to notice.

C. E. Hovey, a witness for the people, testified to a conversation that he overheard between defendant Scott and his wife on the telephone, about the first of July, 1911. The witness stated that after the telephone was hung up Mrs. Scott made a certain statement to him and being asked what she said, over objection, he replied: "Mrs. Scott said after returning to the parlor, in the presence of my wife and myself, the Campbells better look out which side their bread is buttered on, what they say about me, for every bit of their property is in my name and if Ted Scott should die to-day the Campbells could not get one penny of it unless I chose to give it to them."

The only theory upon which the admissibility of the statement is urged is that she and her husband conspired to commit the crime and therefore it was proper to invoke the rule that "after proof of a conspiracy [evidence may be given of] the act or declaration of a conspirator against his co-conspirator, and relating to the conspiracy." (Code Civ. Proc., sec. 1870, subdiv. 6.) But, granting that the record does contain evidence of a common design to commit the crime and that it was not necessary to introduce this evidence

before receiving said statement, we still think it was not admissible upon the theory contended for because it cannot be said that her declaration "related to the conspiracy." It disclosed rather her animus toward the Campbells and incidentally exhibited a resentful disposition that may have impressed the jury quite unfavorably. Mrs. Scott, however, on cross-examination, being asked if she did not make such a statement, denied it. In view of her direct examination her mental attitude toward the Campbells became a relevant subject for inquiry and the testimony objected to as evidence of her animus was admissible in rebuttal. It was received out of order, but this was to accommodate the witness, Hovey, and we think the ruling was not prejudicially erroneous.

The ruling of the court on the admission of the complaint in the case of Mildred Scott v. Cary T. Scott, brought for separate support and maintenance, was, we think, clearly erroneous. It was nothing more than the declaration of Mrs. Scott in an entirely different transaction from that before the jury. It was hearsay pure and simple. It was not receivable to impeach Mrs. Scott as she had not been called as a witness. Besides, assuming that her testimony might thus be anticipated, the record shows that no foundation was laid for its introduction. It was not admissible upon the theory of a conspiracy, as it was not in "furtherance of the fraud."

That it was probably very damaging to appellant is a reasonable deduction from several allegations of said complaint setting forth various acts of cruelty and gross indecency and immorality on the part of appellant. Believing these statements, the jury would require little, if any, additional evidence to convict the defendant of the crime charged.

Among other instructions, the court directed the jury as follows: "2. If you believe from the evidence in this case to a moral certainty and beyond a reasonable doubt that the defendant Cary T. Scott transferred in writing to Victor E. Campbell all of his right, title and interest in and to the lands and premises described in the agreement with Humphreys and which has been received in evidence, and that he, the said Scott, thereafter again willfully and with intent to defraud said Campbell and without his consent, sold, bartered or disposed of the same land or any part thereof to another

for a valuable consideration, it is your duty to find the defendant guilty as charged," and "3. If you believe from the evidence to a moral certainty and beyond a reasonable doubt that the defendant, Cary T. Scott, entered into an agreement with another for the exchange of certain lands and that he thereafter assigned, transferred and sold all of his right, title and interest in and to said agreement and in and to the lands therein described to Victor E. Campbell and that the said defendant did thereafter, willfully and with intent to defraud the said Victor E. Campbell and without his consent sell, barter or dispose of the same lands described in said agreement to another person for a valuable consideration, then it is your duty to find the defendant guilty as charged."

The vice of these instructions lies in the implication that it was immaterial whether Scott actually had any interest in the property to convey or to exchange. From instruction 2 the jury would readily conclude that though the complete title were in another, yet if Scott executed an instrument sufficient in form to transfer any interest that might belong to him, that would be sufficient to satisfy the requirement of the statute as to the first sale.

So also it would be a reasonable inference from instruction 3 that the offense would be made out though Humphreys had no interest whatever in the lands in question.

The instructions ignore the fact that the statute presupposes that the party charged with the fraud must have some title, legal or equitable, which he can and does sell.

Nor can it be said that this is not an issue to be determined by the jury. It is one of the necessary facts to be established before a conviction is justified. Any question of law as to what facts must be shown to constitute title is a subject for the cognizance of the court and for specific directions to the jury, but the ultimate fact of ownership or title must be determined by the jury as one of the elements that make up the crime.

If the evidence necessarily led to the conclusion that appellant was the owner of the property at the time, manifestly the said instructions would appear as without prejudice in accordance with the doctrine announced in *People* v. *Putnam*, 129 Cal. 258, [61 Pac. 961], that "An instruction which assumes

a fact as proved will not warrant a reversal if the fact is admitted, or there is no shadow of conflict of evidence with respect to it.''

The record here does not show such a case and the said instructions, as we view them, should not have been given without the suggested modification.

Many other errors are assigned, but we deem it unnecessary to discuss them at this time.

We believe that the interests of justice require that the conviction of appellant be set aside and the judgment and the order denying his motion for a new trial are, therefore, reversed.

Chipman, P. J., and Hart, J., concurred.